UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRISTINE OCAMPO,

               Plaintiff,

     vs.

THE GUARDIAN LIFE INSURANCE
COMPANY OF AMERICA; and DOES
1 through 10, inclusive,

               Defendants.

CASE NO.

PLAINTIFF'S COMPLAINT FOR
RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND
CLARIFICATION OF RIGHTS; PRE-
JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES

## JURISDICTION AND VENUE

    1.    Plaintiff, Christine Ocampo ("Plaintiff"), brings this action to recover benefits and to enforce and clarify her rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B). This Court has subject-matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 1

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

1
2
3
4
5
6
7
8
9
10

2.    Venue lies in the Western District of Washington, pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this district, the alleged breaches occurred in this district, and the ERISA-governed plan at issue was administered in part in this district.  Venue is also proper pursuant to 28 U.S.C. Section 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred within this district.  Because Defendant terminated Plaintiff's benefits effective June 13, 2023, she would have received her long-term disability ("LTD") benefits in Auburn, Washington where she lives (and has lived) for many years and, therefore, that is where the breach took place, which makes this the proper judicial district.

11

## THE PARTIES

12
13
14
15
16
17
18
19

3.    Plaintiff is an individual who, at all times relevant to this action, was a citizen and resident of the State of Washington, City of Auburn, Pierce County. Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA Section 3(7), 29 U.S.C. Section 1002(7), in the employee welfare benefit plan (the "Plan") established by her former employer Sumitovant Biopharma, Inc. ("Sumitovant"), through the Guardian Life Insurance Company of America, a Group Long Term Disability Income Insurance, Group Policy No. 00026885 (the "Policy"), which is at issue in this action.

20
21
22
23
24
25

4.    Defendant The Guardian Life Insurance Company of America ("Guardian"), at all times relevant, administered long-term disability ("LTD") benefits provided to Plan participants, including Plaintiff, by issuing the Policy.  That Policy and the Plan promised to pay LTD benefits to Plaintiff should she become disabled. Guardian has acted as a claim administrator and as an ERISA claim fiduciary of the Plan.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 2

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1    5.    The true names and capacities, whether individual, corporate,

2    associate or otherwise, of the defendants named herein as DOES 1 through 10,

3    inclusive, are unknown to Plaintiff at this time.  Plaintiff therefore sue DOES 1

4    through 10 by fictitious names and will ask leave of the Court to amend this

5    Complaint to show the true names and capacities of DOES 1 through 10 when the

6    same are ascertained.  DOES 1 through 10 are sued as principals and/or agents,

7    servants, attorneys, or employees of said principals, and all of the acts performed

8    by them were within the course and scope of their authority and employment.

9    Plaintiff is informed and believes and thereupon alleges that each of DOES 1

10   through 10 is legally responsible in some manner for the events referred to herein,

11   and directly and proximately caused the damages and injuries to Plaintiff, as

12   hereinafter alleged.

13                        **FACTUAL BACKGROUND**

14   6.    Plaintiff is a cancer survivor.  She is also a driven, hard-working

15   professional, accomplished, and loyal person, and a dedicated employee and wife.

16   She is a high-level financial executive who has over 25 years of public company

17   experience across a wide spectrum of corporate functions including: accounting,

18   tax, financial planning and analysis, audit, SEC reporting, capital raising, mergers

19   and acquisitions, investor relations, corporate governance, business development,

20   human resources, and operations including IT and facilities.  She started working

21   for  Sumitovant in 2021 (after her prior company, Urovant, where she was working

22   since 2017, was acquired by Sumitovant).    Sumitovant is a global

23   biopharmaceutical company with multiple FDA-approved products and a robust

24   pipeline of investigational assets addressing unmet need in pediatrics, urology,

25   oncology, women's health, specialty respiratory and rare diseases.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 3

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

7.      At the time when Plaintiff became disabled, on November 15, 2022, she was employed by Sumitovant in the capacity of Senior Vice President and Chief Accounting Officer, working full time with significant overtime, earning over $370,000 annually in income.  She was responsible for managing all accounting functions across all of Sumitovant's entities (as of November 2022, Sumitovant was comprised of 34 entities across multiple countries including U.S., Japan, Switzerland, U.K., Ireland, and Bermuda).  She was involved in all aspects of the preparation of monthly, quarterly, and annual accounting statements, financial reports, and accounting audits.  She oversaw the handling of the compliance procedures and auditing of all internal accounting.   Her job duties included: developing accounting strategies, assisting external financial audits, drafting and reviewing reports and statements, preparing presentations, and researching compliance procedures and cost benefit strategies for both domestic and international accounting procedures.  Plaintiff's daily schedule consisted of multiple meetings, sometimes starting as early as 7:00 a.m. until late in the evenings, past 11:00 p.m. because Sumitovant is a global organization with offices in Asia, the U.S., and Europe, and thus, required conference meetings in different time zones. Additionally, Plaintiff participated in meetings with Sumitovant's parent company and multiple departments, subsidiaries, fellow executives, staff, and outside consultants such as accounting firms and law firms. She also managed a team of 40 employees and assisted some of them with coaching for their professional development.   She spent between two and three hours daily reviewing and responding to emails, and two to three hours reviewing work products of other employees, and drafting financial analysis, and presentations for upcoming meetings.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 4

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1        8.     Plaintiff worked in a fast-paced, challenging environment that required

2  paying strict attention to detail, maintaining focus and concentration for extended

3  periods of time.  The documents that Plaintiff regularly reviewed were complex and

4  had highly technical information, often involving technical language and

5  interpretation of multi-continent accounting rules for entity financial consolidations

6  and preparation of tax returns.  The spreadsheets often included complex formulas

7  and hyperlinks to outside data, thus adding another level of difficulty when

8  interpreting the information presented in these spreadsheets.  Plaintiff was also

9  responsible for designing and implementing a tax strategy across multiple tax

10  jurisdictions spanning the United States, Japan, Switzerland, the United Kingdom,

11  Ireland and Bermuda, to simplify and reduce the tax impact on the company in all

12  jurisdictions.  As Chief Accounting Officer, it was her responsibility to ensure that

13  financial statements were reported consistently with both accounting regulations in

14  the United States of America and any international financial reporting standards.

15  She managed accounting functions across Sumitovant's 34 entities, managed

16  preparation of financial reporting packages, and managed audited financial

17  statements, among numerous other activities.  New standards are issued every

18  quarter, both internationally and in the USA, and these standards had to be

19  analyzed and assessed accordingly by Plaintiff and her team.  Every time when

20  Sumitovant entered into a business development transaction that modified the

21  organizational structure in any way, Plaintiff was responsible for assessing the

22  accounting standards that had to be implemented and applied accordingly.

23  Plaintiff's job responsibilities and functions were quite vast, very sophisticated and

24  complex, mentally and cognitively intensive, requiring physical and mental

25  endurance to endure long workdays, requiring a lot of focus, and requiring someone

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 5

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

1    (such as Plaintiff) to have special skill sets, abilities, knowledge, training and

2    significant experience in order to perform her job position adequately.

3          9.    Plaintiff loved her job and was proud of her successful career and

4    accomplishments.  She was forced to end her career due to mental and physical

5    side effects from her cancer treatment and multiple breast reconstruction surgeries.

6    Soon after her major breast reconstruction surgery (on November 15, 2022),

7    Plaintiff experienced extreme and chronic fatigue, severe cognitive impairment,

8    memory and concentration problems, brain fog, insomnia, night terrors and sweats,

9    and shooting pain in her breasts – all of which contributed to her inability to return

10   to her job.  She had limitations and restrictions on her ability to perform mental and

11   physical tasks associated with her job responsibilities and daily tasks at home.  She

12   would never have stopped working and filed a disability claim and jeopardized her

13   substantial income and beloved position if she could work.

14         10.    In her application for disability, Plaintiff stated that due to mental

15   impairment, cognitive decline and the physical limitations of joint neuropathy and

16   breast pain following her breast reconstruction surgery on November 15, 2022, she

17   was unable to perform the daily tasks of her job.

18   **Relevant Policy Terms and Guardian's Denial**

19         11.    Pursuant to the terms and conditions of the Policy, Plaintiff is entitled

20   to LTD benefits because she met and continues to meet the Policy's operative

21   definition of "Disabled" and the other conditions necessary to qualify for LTD

22   benefits during the relevant time period.   The Policy expressly provides the

23   following relevant terms:

24         **Disability or Disabled:** These terms mean that a current Sickness or
           Injury causes impairment to such a degree that You are:

25

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 6

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

• Not able to perform, on a Full-Time basis, the major duties of Your Own Occupation during the Elimination Period and the Own Occupation period.

• Not able to perform, on a Full-Time basis, the major duties of any Gainful Work after the end of the Own Occupation period.

•You are not Disabled if You earn, or are able to earn, more than this Plan's maximum allowed Disability Earnings. If, prior to Your Disability, You are required to work more than 40 hours per week on average, You will not be considered Disabled if You can work for 40 hours per week.

**Gross Monthly Benefit:** 60% of Your Insured Earnings to a maximum benefit of $12,000.

**Insured Earnings:** Only Your earnings from the Employer will be included as Insured Earnings. We calculate benefit amounts and limits based on the amount of Your Insured Earnings as of the date immediately prior to the start of Your Disability.

**Maximum Capacity Earnings:** During the Own Occupation period, this term means the income You could earn if working to the fullest extent to which You are able in Your Own Occupation. After the Own Occupation period, this term means the income You could earn if working to the fullest extent to which You are able in any Gainful Occupation. We decide the fullest extent of work You are able to do based on objective data provided by any or all of the following sources: (1) Your treating Doctor; (2) impartial medical or vocational exams; (3) peer review specialists; (4) functional capacities exams; and (5) other medical and vocational specialists whose area of expertise is appropriate to Your Disability.

**Objective Medical Evidence:** This term includes but is not limited to: (1) diagnostic testing; (2) laboratory reports; and (3) medical records of a doctor's exam documenting clinical signs, presence of symptoms and test results consistent with generally accepted medical standards supported by nationally recognized authorities in the health care field.

**Objective Proof of Your Restrictions and Limitations:** During the Own Occupation period this term means objective proof of Your inability to perform the duties of Your Own Occupation and including all restrictions and limitations relating to Your inability to work. After the Own Occupation period, this term means objective proof of Your

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 7

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

inability to perform the duties of any Gainful Work and including all restrictions and limitations relating to Your inability to work.

**Own Occupation:** This term means:
• The occupation(s): You are routinely performing immediately prior to Disability; (2) which is Your primary source of income prior to Disability; and (3) for which You are covered under this Plan.  Occupation includes any employment, trade or profession that are related in terms of similar tasks, functions, skills, abilities, knowledge, training, and experience required by Employers from those engaged in a particular occupation in the general labor market in the national economy. Occupation is not specific to a certain Employer or a certain location.

12.    Pursuant to the terms and conditions of the Plan, Plaintiff is entitled to LTD benefits because she has met, and continues to meet, the Plan's operative definition of "disabled" and the other conditions necessary to qualify for LTD benefits during the time period.  Plaintiff has been disabled since November 15, 2022, when she underwent major breast reconstruction surgery that gave rise to her disabling symptoms.

13.    Guardian initially approved Plaintiff for short-term disability ("STD") benefits, after she applied for these benefits, and paid STD benefits for the maximum allowed time of twelve weeks, from November 22, 2022 until January 13, 2023, evidencing that Guardian acknowledged that Plaintiff had a disabling medical condition, pursuant to which she was eligible and entitled to STD benefits.

14.    After exhausting her STD benefits, Plaintiff submitted her LTD application on February 27, 2023.  Guardian approved her claim and paid her LTD benefits from February 13, 2023 until June 12, 2023, when it unreasonably and abruptly discontinued paying such benefits, despite having received no medical evidence that Plaintiff had obtained a significant improvement of her disabling symptoms.

**LePLEY LAW FIRM**
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

15.     On February 9, 2024, Plaintiff submitted an appeal and requested reconsideration of Guardian's decision to discontinue her LTD benefits.  Her appeal included significant objective medical evidence in support of her continued eligibility for LTD benefits.  She claimed that she still experienced the disabling symptoms of her medical conditions, and that she had restrictions on and limitations to her ability to perform her job due to cognitive impairment, extreme and chronic fatigue, memory and concentration problems, brain fog, insomnia, night terrors and sweats, and occasional shooting pain in her joints and breasts.

16.     On May 13, 2024, Guardian advised Plaintiff, via a letter, that after further review, it was not able to approve continued LTD benefits.  Guardian stated the following grounds for its decision: (1) Plaintiff's medical condition did not support restrictions and limitations that precluded her from performing her own sedentary occupation on a full-time basis; (2) Guardian alleged that there was no credible and consistent subjective or objective information available to demonstrate that Plaintiff's conditions were severe enough to impact her daily functioning as of June 13, 2023 and beyond; (3) The external peer physician consultants opined that Plaintiff had no limiting conditions as of June 13, 2023, and beyond.  Therefore, Guardian claimed that Plaintiff was not disabled and incapable of performing the major duties of her own occupation as of June 13, 2023 and thereafter.

17.     Guardian's denial of Plaintiff's appeal contained a notification that Plaintiff's Statute of Limitations to file an ERISA lawsuit would expire on May 13, 2027. Thus, this lawsuit is timely filed.

18.     In this lawsuit, Plaintiff seeks to recover LTD benefits from Guardian because she continued to suffer from disabling symptoms related to her three breast reconstruction surgeries and related cancer treatment, and she is entitled to LTD

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 9

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1 benefits from June 13, 2023 onward, because she continues to experience the

2 symptoms to-date and has submitted sufficient medical evidence to establish her

3 disability, supported by her treating physicians.

4      19.    Plaintiff, at all times relevant, has been totally disabled within the

5 meaning of the Policy.  She is entitled to continued monthly disability benefits

6 according to the Policy, commencing on June 13, 2023, subject to the Policy's

7 "Gross Monthly Benefit" and "Insured Earnings" sections.  Plaintiff is entitled to 60%

8 of her "Basic Monthly Earnings" ($29,166.67), i.e., $17,500.00 per month.  Because

9 her Policy limits her maximum benefit to $12,000.00 per month, she is entitled to

10 monthly LTD benefits of $12,000.00.

11 **Plaintiff's Surgical and Medical History**

12      20.    In March of 2018, Plaintiff was diagnosed with breast cancer and

13 thereafter underwent a double mastectomy.  After prolonged treatment that involved

14 surgeries and endocrine therapy, Plaintiff was able to achieve a remission.  She was

15 prescribed the medication Tamoxifen by her treating physicians and had been taking

16 it for approximately six years to block estrogen because her tumor was estrogen and

17 progesterone positive.

18      21.    However, as a result of ongoing physical discomfort and physical

19 limitations from her double mastectomy, Plaintiff had to undergo additional breast

20 reconstruction.  On November 15, 2022, Plaintiff obtained a leave of absence to

21 undergo major breast reconstruction surgery that included a breast implant

22 capsulectomy followed by DIEP flap breast reconstruction ("DIEP Flap Surgery").

23 The surgery took over 10 hours and was performed by a team of three surgeons,

24 presided over by highly experienced breast reconstruction surgeon Otway Louie,

25 M.D., at the University of Washington Medical Center in Seattle, Washington.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 10

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

22.    Dr. Louie advised Plaintiff that the expected physical recovery period, absent complications, should be approximately three months.  Plaintiff applied for STD benefits with Guardian and was approved to receive STD payments from November 22, 2022 until January 13, 2023 under Claim Number 230852695-00.

23.    In support of Plaintiff's STD application, Dr. Louie completed, and Plaintiff submitted to Guardian, an Attending Physician's Statement ("APS"), dated January 9, 2023, which listed a **projected** return-to-work date of January 14, 2023. (Emphasis added.) He was estimating Plaintiff's return-to-work date based on a fact scenario in which she would have a smooth recovery period with no resulting complications.  Dr. Louie indicated that her restrictions and limitations consisted of no heavy lifting or pulling or pushing over ten pounds for four weeks after discharge from the hospital, then would gradually decrease.  Guardian incorrectly stated several times in its denial of continued LTD benefits letters that Plaintiff was cleared to return to work on January 14, 2023, when this projected return to work date was solely provided by Dr. Louie in support of Plaintiff's STD application after her first surgery *, and did not account for Plaintiff's complications and the following two breast surgeries*.  Moreover, Dr. Louie submitted a second APS on March 26, 2023 with as estimated return to work date of June 16, 2023. Thus, Guardian's claims that Plaintiff should have returned to work on January 14, 2023 should be disregarded.

24.    Contrary to Dr. Louie's expectations of uneventful recovery, immediately after the surgery, Plaintiff started experiencing multiple disabling symptoms that affected her ability to function and to perform even the most mundane everyday task, specifically cognitive impairment, memory and concentration problems, chronic fatigue, neuropathy, and brain fog.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 11

**LePLEY LAW FIRM**
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

25.     Plaintiff submitted voluminous medical records to Guardian that evidence her medical conditions and the limitations to her returning to work.  As of June 13, 2023, she had continued to suffer difficulty with concentrating and suffered decreased working memory, word finding, and verbal fluency caused by significant cognitive impairment.  She suffered from extreme chronic fatigue that interfered with her ability to lead her team and attend conference meetings to create, manage, and execute complex accounting strategies.  Plaintiff's brain fog, insomnia, night terrors and excessive sleepiness interfered with her ability to concentrate during the day and to complete even simple daily tasks, let alone review data and perform challenging accounting functions.  The shooting pain in her breasts and the numbness and pain in her limbs necessitated a treatment with high doses of pain medications that caused drowsiness and additional executive dysfunction, and she could no longer work in any type of gainful occupation.

26.     In January 2023, after it became obvious that she could not physically or mentally perform her job duties, Plaintiff notified her employer that she could not return to work because she was experiencing disabling symptoms related to her DIEP FLAP Surgery, which caused severe restrictions and limitations to her ability to work.

27.     On February 27, 2023, Plaintiff submitted to Guardian her application for LTD benefits under the Policy.  In her application, Plaintiff listed the causes of her disability as cognitive impairment, anxiety, depression, and post-surgery complications from her DIEP Flap Surgery such as fatigue, tiredness, brain fog, insomnia, hot flashes, pain, and general discomfort.  She stated that her constant exhaustion, fatigue, and poor mental state precluded her from performing the work required by her occupation and that her treating physicians recommended a second

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 12

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

1 breast revision surgery to correct some of the issues with her November 15, 2022
2 surgery.

3        28.     After consideration of her medical records and overwhelming evidence
4 in support of her disability diagnosis, Guardian approved Plaintiff's LTD benefits on
5 April 27, 2023, in the amount of $12,000 monthly, commencing retroactively on
6 February 13, 2023.  Plaintiff received LTD benefits from February 13 to June 12,
7 2023, when they were abruptly discontinued, despite there being no objective
8 medical evidence that Plaintiff's medical conditions had improved.

9        29.     On May 5, 2023, pursuant to the advice of Dr. Louie, Plaintiff had to
10 undergo a second breast reconstruction surgery, performed by the same surgeon at
11 the University of Washington Medical Center.  The second surgery ("Revision
12 Surgery") was a follow-up to her November 15, 2022 DIEP Flap Surgery, and
13 included reconstruction, bilateral breast revision, insertion, fat graft, and revision of
14 abdominal scars resulting from the DIEP Flap Surgery.

15        30.     Dr. Louie stated in his March 26, 2023 APS that in his professional
16 opinion, Plaintiff was eligible for continuing disability status.  He listed a projected
17 period of recovery that extended to June 16, 2023.  As this was Plaintiff's second
18 surgery less than six months of the DIEP Flap Surgery, she continued to suffer from
19 the same disabling symptoms as those from her DIEP Flap Surgery.  She had
20 similar cognitive and physical restrictions and limitations to her ability to work.  She
21 could not walk, lift, or sit for prolonged periods of time.  She was not able to work in
22 her own occupation, which required the ability to manage a mentally challenging
23 work schedule of constant meetings, training, and review and analysis of complex
24 financial data and spreadsheets.  Her memory and ability to concentrate remained
25 poor.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 13

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

31.     Guardian's physicians' report indicates that on April 10 and April 11, 2024, three calls were placed to Dr. Louie's office on each date and voicemails were left requesting callbacks to schedule peer discussions at the phone number (208) 598-1217.  Additionally, the same report alleges that on April 10, 2024, three faxes were faxed to Dr. Louie's office requesting to schedule peer discussions at fax number (208) 598-5212.

32.     However, Plaintiff contacted Dr. Louie's office, and his nurse, Jenny, stated that their phone number is (206) 598-1217 and their fax is (206) 598-5212, and that no such voicemails and faxes were received by Dr. Louie on either April 10 or April 11, 2024. The only fax that Dr. Louie's office received from Guardian was on March 26, 2024. Thus, Guardian's consultants erroneously used the wrong area code when they purportedly called and faxed a request to the incorrect fax number for Dr. Louie's office. As a result of their errors and own failure to contact Dr. Louie at the correct office phone and fax numbers, Guardian's physicians' consultants never completed peer review consultations with Dr. Louie.  Their failure to discuss Plaintiff's limitations and restrictions on her ability to return to work with her treating physician affected their ultimate opinions regarding Plaintiff's medical records and ongoing treatment.  Thus, their opinions are inconclusive and inaccurate.

33.     Despite Plaintiff's continued need for LTD benefits during the period of recovery from her second surgery, Guardian discontinued her LTD benefits as of June 12, 2023.  Plaintiff had not achieved a meaningful improvement, and her medical records clearly indicated that she continued to experience disabling symptoms that prevented her from returning to work.

34.     On October 9, 2023, Plaintiff had to undergo a third breast reconstruction surgery ("Third Surgery") to complete the revisions and reconstruction

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 14

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1  of her breasts, which was related to her prior two surgeries in the preceding ten

2  months.  During her post-surgery recovery period, she experienced an ongoing

3  lasting cognitive decline and continued to experience related disabling symptoms

4  and physical pain, similar in nature to the symptoms that she started to have since

5  her DIEP Flap Surgery on November 15, 2022, but her symptoms were exacerbated

6  due to the multiple surgeries within a very short time period.

7       35.    On July 21, 2023, during her ongoing disability, Plaintiff was abruptly

8  terminated from her job with Sumitovant due to a consolidation of Sumitovant and its

9  multiple subsidiaries, even though her employer indicated to Guardian (via an email

10  on March 27, 2023 from Julia Law to Guardian) that Sumitovant was holding

11  Plaintiff's position open until she recovered and was able to return to work, and that

12  Plaintiff never had any performance or attendance issues before her disability.  It

13  was always Plaintiff's intention to return to work once she achieved significant

14  improvement in her disabling symptoms.  However, she never recovered before her

15  termination on July 21, 2023.

16       36.    On August 22, 2023, Guardian notified Plaintiff, via a letter, that it had

17  terminated her LTD benefits, effective June 12, 2023, because "the information on

18  file at present did not support her continued disability as defined by the plan."

19  Guardian's denial claim letter incorrectly interpreted her medical records and made

20  several misstatements about the procedural history of her claim, the

21  recommendations and opinions of her treating physicians supporting her disability

22  status, and the restrictions and limitations that she experienced.  Guardian

23  terminated Plaintiff' benefits just one month before her job termination.

24       37.    First, the August 22, 2023 denial letter incorrectly stated that Dr. Louie

25  had indicated via an APS that Plaintiff was released to return to work on a full-time

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 15

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

basis as of January 14, 2023.  That APS was provided in support of Plaintiff's STD claim and was evaluating her physical restrictions and limitations related to her first surgery, not her cognitive restrictions or the myriads of other disabling symptoms related to her pain medications and cognitive dysfunction that followed her first surgery and persisted for months after that.  Moreover, it was only a "projected" return to work date, and not a firm, applicable-to-all, return to work date.  Dr. Louie's second APS on March 26, 2023 provided an estimated return to work date of June 16, 2023.

38.     Second, Guardian incorrectly stated that Plaintiff did not have LTD coverage at the time when she became disabled (February 22, 2023) from a psychiatric standpoint.  Plaintiff had LTD coverage because her disability symptoms did not have an initial onset on or around February 22, 2023 due to a newly identified medical condition, but the symptoms were directly related to her medical condition of cognitive dysfunction, mental impairment, physical pain, and other disabling symptoms that occurred right after her DIEP Flap Surgery on November 15, 2022.

39.     Guardian improperly defined Plaintiff's disabling medical condition as a new mental disorder diagnosis, attempting to create two separate disabling medical conditions and claim that there was a gap in LTD coverage between Plaintiff's disabilities, when in fact Plaintiff suffered from the same medical conditions of cognitive impairment, memory and concentration problems, and severe chronic fatigue since November 15, 2022.

40.     Guardian improperly defined Plaintiff's disabling medical condition as a new mental disorder diagnosis, attempting to create two separate disabling medical conditions and claim that there was a gap in LTD coverage between Plaintiff's

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 16

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1    disabilities, when in fact Plaintiff suffered from the same medical conditions of

2    cognitive impairment, memory and concentration problems, and severe chronic

3    fatigue since November 15, 2022.

4         41.    Contrary to Guardian's statements, Plaintiff received ongoing treatment

5    from Vitaly Shaulov, M.D., a psychiatrist, and his nurse practitioner, Angela

6    Hernandez, for her complaints of cognitive impairment, memory and concentration

7    issues, chronic fatigue, and brain fog, which were symptoms that she started

8    experiencing after her DIEP Flap Surgery.  Guardian falsely claimed that Plaintiff

9    started treatment on February 22, 2023, with Dr. Shaulov and Angela Hernandez, for

10   a newly diagnosed mental disorder medical condition, and thus, she "did not have

11   LTD coverage at the time she became disabled on February 22, 2023, from a

12   psychiatric standpoint."

13        42.    Plaintiff consistently received medical treatment from Dr. Shaulov and

14   Ms. Hernandez for her aggravation of cognitive dysfunction symptoms following her

15   DIEP Flap Surgery on November 15, 2022, evidenced by submitted medical visits

16   records, dated December 6, 2022; January 25, 2023; February 1, 2023; February

17   22, 2023; and subsequent visits on April 4, 2023; June 12, 2023; September 11,

18   2023, and January 24, 2024.

19        43.    The medical visit record from February 22, 2023 specifically states that

20   Plaintiff was still recovering from surgery and her cognition was still "foggy"

21   compared to it being poor right after her DIEP Flap Surgery.  Plaintiff was advised to

22   add the medication Strattera to her other medications of Lexapro and

23   Dextroamphetamine Sulfate to treat her ongoing symptoms.  The record also listed

24   Plaintiff's complaints of cognitive decline, memory loss, brain fog, chronic fatigue,

25

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 17

**LePLEY LAW FIRM**
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1  and intermittent incision pain, consistent with ongoing disabling symptoms related to

2  her first surgery.

3      44.    Supporting Plaintiff's restrictions and limitations, Dr. Shaulov

4  completed an APS on April 12, 2023, stating that he had treated Plaintiff with

5  psychotherapy and the medications Dextroamphetamine Sulfate and Lexapro for her

6  cognitive dysfunction and major depressive disorder that she started experiencing

7  on November 15, 2022.

8      45.    In his APS, Dr. Shaulov opined that Plaintiff had brain fog, inability to

9  focus and concentrate, major depressive disorder, and ADHD, with an onset of

10  these symptoms on November 15, 2022, and he recommended that Plaintiff stop

11  working as of February 22, 2023.  He concluded, after examination, that Plaintiff had

12  moderate impairment in occupational functioning with a current Global Assessment

13  of Functioning ("GAF") in the range of 45 out of 90. He listed an anticipated return-

14  to-work date of October 1, 2023.  Dr. Shaulov was not aware at the time he

15  completed the APS that Plaintiff would be scheduled to have a third breast

16  reconstruction surgery on October 9, 2023, which would further aggravate her

17  cognitive symptoms and contribute to her continued eligibility for disability benefits.

18      46.    Dr. Shaulov's medical opinion agreed with the medical opinions of all

19  of Plaintiff's other treating physicians, who indicated in their medical records,

20  certifications and medical visit summaries that Plaintiff's restrictions and limitations

21  and her resulting disability was directly related to and the result of her breast

22  reconstruction DIEP Flap Surgery on November 15, 2022, and continued surgeries

23  that required additional sedation and recovery periods of several months for each

24  corresponding surgery.

25

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 18

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

47.    Guardian's physicians' consultants alleged that they attempted to contact Dr. Shaulov's office for peer review consultations, but only one of the consultants stated in his report that a peer review call occurred on April 16, 2024 (Dr. Justin Stamschror). However, when Plaintiff contacted Dr. Shaulov's office, there were no notes in the medical records that a consultation occurred on April 16, 2024. Dr. Shaulov stated that he could not recollect if such consultation in fact took place on April 16, 2024 because according to their office procedure, these peer review consultations should have been recorded in Plaintiff's medical records. Plaintiff was not able to verify that this consultation occurred. Thus, the opinions of Guardian's physicians were reached without the valuable input of a meaningful peer review discussion with Plaintiff's treating physician Dr. Shaulov.

48.    Plaintiff's disability diagnosis is supported by her other treating physician, Maziar Zamani, M.D., a family practitioner, who opined in his certification letter dated February 6, 2024, that Plaintiff's extensive history of disabling medical conditions qualified her for disability benefits. In his letter, Dr. Zamani stated that in his professional opinion, Plaintiff "has been unable to work since her DIEP Flap Surgery due to cognitive and memory dysfunction; brain fog; severe and chronic fatigue; excessive sleepiness; inability to focus and concentrate on even simple daily tasks; exhaustion and needing to take daytime naps following simple daily tasks; insomnia; sleep terrors; night sweats; joint pain in hands, elbow and other joints; eye sensitivity to light; depression; and anxiety."

49.    Guardian did not give sufficient credit to Dr. Zamani's medical opinions, who has been treating Plaintiff since 2018, and was therefore in the best position to evaluate her ongoing disabling symptoms. In its May 13, 2024 denial of LTD benefits letter, Guardian incorrectly stated that "the only clinical information

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 19

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1    submitted from Dr. Zamani on appeal was a telephone visit note dated February 5,

2    2024."

3        50.    In his February 6, 2024 certification letter, Dr. Zamani specifically

4    stated that he was a primary care physician for Plaintiff and that she had been under

5    his care since 2018.  Therefore, Dr. Zamani was familiar with her medical history

6    and her various medical issues, procedures, diagnoses, and treatments since she

7    had been under his care.  Dr. Zamani stated that he examined Plaintiff on December

8    7, 2023 and that after review of the blood tests he previously ordered (completed by

9    Plaintiff on January 30, 2024), he diagnosed her as having chronic fatigue,

10   peripheral neuropathy and B12 deficiency, among other ailments related to her

11   breast reconstruction surgeries.

12       51.    In Dr. Zamani's professional opinion, Plaintiff's medical conditions'

13   symptoms resulted in restrictions on and limitations to her return to work, and he

14   concluded that there was sufficient objective evidence of her disability.  His summary

15   explicitly stated that as of February 6, 2024, Plaintiff had numerous and severe

16   symptoms that had resulted in her inability to be gainfully employed since November

17   2022. Specifically, Dr. Zamani listed the following restrictions and limitations that

18   were supported by Plaintiff's medical conditions:

19   •   **NEUROLOGICAL:** The symptoms of cognitive dysfunction, memory
20       dysfunction, brain fog, memory loss, severe attention deficit (ADHD),
         reduced comprehension, and poor executive functioning, keep Plaintiff
21       from working due to her inability to concentrate and focus, process and
         comprehend new information; complete tasks; make decisions; meet
22       deadlines; articulate thoughts; multi task; participate in meetings; keep
         consistent schedule; follow directions; perform mathematical
23       calculations; work on spreadsheets; analyze financial data; and
         supervise staff.

24

25

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 20

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

1

2

3

4

5

6

- **CHRONIC FATIGUE:** The symptoms of severe physical and mental fatigue and exhaustion and poor endurance keep Plaintiff from working due to her inability to do any work requiring any deadlines, or have any fixed schedule requirements, and does not allow extended naps per day. Plaintiff will be unable to attend and participate in any extended meetings and conference calls, unable to perform any tasks requiring mental endurance such as preparing and/or reviewing spreadsheets and be unable to prepare or reply to numerous e-mails throughout the workday.

7

8

9

10

- **PAIN:** The symptoms of joint pain in hands and other joints, carpel tunnel, leg pain from knee down, breast pain keep Plaintiff from working due to her inability to do any computer work such as typing e-mails, gripping/handling a computer mouse, data entry using a numerical keyboard, for any extended period of time, inability to sit at a desk job for an extended period of time.

11

12

13

- **SLEEP:** The symptoms of insomnia, sleep terrors, night sweats, unrefreshed sleep, cause Plaintiff to be easily exhausted, and have low energy throughout the day, lack of endurance, and require naps during the workday.

14

15

16

- **MENTAL:** The symptoms of depression, anxiety, stress, and mood swings cause Plaintiff difficulty coping and handling any job stress, inability to cope and handle any difficult tasks and/or any difficult co-workers; irritability and mood swings would cause disruption and poor productivity in work environment.

17

18

19

- **SENSITIVITIES:** The symptoms of eye sensitivity to bright light will keep Plaintiff from working due to her inability to work in a brightly lit office environment.

20

21

22

23

24

25

52.     Guardian terminated Plaintiff's LTD benefits by providing vague and inconclusive reasons that claimed that Plaintiff failed to supply Objective Medical Evidence or objective restrictions and limitations that showed her inability to work. Yet, Dr. Zamani's medical opinions agreed with Drs. Louie and Shaulov's opinions that directly contradict Guardian's consultant physicians' conclusionary "pure paper review" opinions and conclusions in its denial of disability benefits.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 21

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

53.     Plaintiff underwent a comprehensive neuropsychological evaluation, performed by Nicholas Jones, PhD., a clinical psychologist, to evaluate her severe cognitive decline and chronic fatigue after her three breast reconstruction surgeries in the span of only ten months from November 15, 2022 to October 9, 2023.  Dr. Jones examined Plaintiff on November 14, November 28, November 29, and December 12, 2023.  After extensive testing and interpretation of the data, Dr. Jones diagnosed Plaintiff with: G31.84 Mild neurocognitive disorder without behavioral disturbances, F33.1 Major Depressive Disorder, recurrent, moderate with anxious distress, and F90.2 Attention Deficit/Hyperactivity Disorder, combined presentation.

54.     The following tests, reliable and generally accepted in the relevant scientific community, were utilized by Dr. Jones in reaching the above stated diagnoses:

**General Anxiety Disorder – 7 (GAD-7)**
Client was given the GAD-7, which is a clinical outcome measure of symptoms of anxiety. Client's score was 0/21, indicating minimal symptoms of anxiety.

**Patient Health Questionnaire – 9 (PHQ-9)**
Client was given the PHQ-9, which is a clinical outcome measure of symptoms related to depression. Client's score was 18/27, indicating moderately severe symptoms of depression.

**Perceived Stress Scale (PSS)**
Client was given the PSS, which is a multipurpose instrument for objectively determining severity of perceived stress symptoms. Client scored a 29/40, indicating high perceived stress symptoms.

**Autism Spectrum Quotient (AQ-10)**
The AQ-10 is a brief screening measure that assesses probability for autism. His raw score of 5, indicates low probability for autism traits.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 22

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Adult Symptom Reporting Scale for ADHD (ASRS)**
Client was given the ASRS, which is a self-report measure of symptoms related to ADHD. Client obtained a score of 5, which is indicative of symptoms that are consistent with ADHD.

**Wender Utah Rating Scale (WURS)**
The WURS is also a self-report measure to assess for symptoms of ADHD and is less face-valid than the Adult Self-Report Scales for ADHD, making it slightly less likely a client will over report. Her score of 1, suggests that Client likely did not experience symptoms of ADHD as a child.

**Brown Executive Function/Attention Scales – (Brown – EF/A) - Self-report**
The Brown EF-A is a self-report measure of an individual's subjective experiences regarding all aspects of executive functioning. Higher scores typically indicate that the individual believes they struggle with the areas being assessed at a higher rate than their peers believe they struggle with the same aspects. She reported challenges in activation (99th percentile), focus (99th percentile), effort (99th percentile), emotion (85th percentile), memory (99th percentile), and action (98th percentile). Her total composite score was in the 99th percentile.

**Creyos Cognitive Assessment**
Creyos is an assessment of current state of cognitive functioning and is a good measure of brain health. It measures one's current memory, reasoning, processing, planning, and concentration related skills.

**Below Average Range**
- Monkey Ladder - Standard score of 81, 10th percentile, below the average range.
- Token Search - Standard score of 85, 16th percentile, below the average range.
- Rotations - Standard score of 84, 15th percentile, below the average range.
- Polygons - Standard score of 86, 18th percentile, below the average range.
- Digit Span - Standard score of 79, 8th percentile, below the average range.
- Feature Match - Standard score of 81, 11th percentile, below the average range.
- Double Trouble - Standard score of 81, 10th percentile, below the average range.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 23

**LePLEY LAW FIRM**
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

**Within Average Range**
- Spatial Span - Standard score of 87, 19th percentile, within the average range.
- Paired Associates - Standard score of 94, 34th percentile, within the average range.
- Odd One Out - Standard score of 90, 26th percentile, within the average range.
- Spatial Planning - Standard score of 97, 43rd percentile, within the average range.
- Grammatical Reasoning - Standard score of 88, 21st percentile, within the average range.

**Color Trails Test**
The Color Trails Test is a non-verbal test that assesses neurological, developmental, and visual deficits. Scores are based on the time it takes to complete each task. Client's scores indicate that she is in the above average range when compared to his same-aged peers on the Color Trails 1 task (69th percentile) and in the above average range on the Color Trails 2 task (76th percentile).

**Stroop Color-Word Test**
The Stroop is a non-verbal test that assesses neurological, developmental, and reading deficits. Her scores were (Wt = <15; Ct = 15; CWt = 24; Int. t = 45). **Patterns where all scores are low, especially below 30 with a normal interference score, as seen here, are often indicative of diffuse brain injuries, meaning an injury that is found throughout the brain.** (Emphasis added.)

**Wechsler Adult Intelligence Scale – 4th Edition (WAIS-IV)**
The WAIS-IV is a measure of general cognitive functioning that includes several summary scores, including a Full Scale IQ (FSIQ), summarizing overall intellectual functioning, and index scores. Her FSIQ falls within the Borderline range (FSIQ = 75, 5th percentile; 95% confidence interval = 71-80). Additional information is derived from the four indexes (listed below) on the WAIS-IV and provides further clarification of cognitive strengths and weaknesses.

Verbal Comprehension Index
The Verbal Comprehension Index (VCI) measures crystallized intelligence and verbal expression of knowledge. Client's verbal reasoning abilities as measured by the VCI are in the Low Average range  compared to her peers (VCI = 83, 13th percentile; 95% confidence interval = 78-89). Client's score in Vocabulary was considered significantly greater than her own mean score,

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 24

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

indicating this was a relative strength.

Perceptual Reasoning Index
In contrast to the VCI, the Perceptual Reasoning Index (PRI) taps into the ability to spatially and non-verbally process information, including the ability to mentally manipulate, visually construct, and reason with abstract information. Overall, Client's perceptual reasoning ability is in the Low Average range compared to their peers (PRI = 86, 18th Percentile; 95% confidence interval = 80-93). Client's score in Block Design was considered significantly greater than her own mean score, indicating this was a relative strength.

Working Memory Index
The Working Memory Index (WMI) measures the mental capacity to hold and manipulate information, and requires attention, focus, and concentration. Client's working memory ability is in the low average range compared to her peers (WMI = 80, 9th percentile; 95% confidence interval 74-88).

Processing Speed Index
The Processing Speed Index (PSI) measures the ability to rapidly scan and process visual information. Client's processing speed is in the Severe range compared to her peers (PSI = 63, 1st percentile; 95% confidence interval 57-74). **Client's score in Symbol Search was considered significantly lower than her own mean score, indicating this was a relative weakness.** (Emphasis added.)

**WAIS-IV Results**

| | Standard Score | Scaled Score | Percentile | Classification |
|---|---|---|---|---|
| **FULL SCALE IQ** | **75** | **--** | **5** | **Borderline** |
| **Verbal Comprehension** | **83** | **--** | **13** | **Low Average** |
| Similarities | -- | 5 | 5 | Borderline |
| Vocabulary | -- | 9 | 37 | Average |
| Information | -- | 7 | 16 | Low Average |
| **Perceptual Reasoning** | **86** | **--** | **18** | **Low Average** |
| Block Design | -- | 10 | 50 | Average |

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 25

| Matrix Reasoning | -- | 6 | 9 | Low Average |
|---|---|---|---|---|
| Visual Puzzles | -- | 7 | 16 | Low Average |
| **Working Memory** | **80** | **--** | **9** | **Low Average** |
| Digit Span | -- | 6 | 9 | Low Average |
| Arithmetic | -- | 7 | 16 | Low Average |
| **Processing Speed** | **62** | **--** | **1** | **Extremely Low** |
| Symbol Search | -- | 2 | 0.4 | Extremely Low |
| Coding | -- | 4 | 2 | Borderline |

*Scaled scores and percentiles are based on the examinee's age.

**Wechsler Memory Scale – 4th Edition (WMS-IV)**
The Wechsler Memory Scale, fourth edition (WMS-IV) assesses deficits in the areas of visual, auditory, immediate, delayed, and working memory. Results from the WMS-IV indicate that Client's memory abilities are in the Impaired to Moderately Impaired range when compared to her same-aged peers. Specific Index score results are examined in detail.

Auditory Memory
The Auditory Memory Index (AMI) is a measure of Client's ability to listen to oral information, and recall it immediately, and then recall the information again after a 20 to 30 minute delay. Client scored in the Impaired range when compared to her peers (AMI = 69, 2nd Percentile; 95% Confidence Interval = 64-77). **Her scores indicate that she struggles greatly with her auditory memory.** (Emphasis added.)

Visual Memory
The Visual Memory Index (VMI) measures one's memory of visual details and spatial locations. Client performed in the Mild Impairment range compared to her peers  (VMI = 67, 1st Percentile; 95% Confidence Interval = 63-74). **Her scores indicate that she struggles greatly with her visual memory.** (Emphasis added.)

Visual Working Memory
The Visual Working Memory Index (VWMI) is a a measure of one's ability to temporarily hold and manipulate spatial locations and visual details. Her scores indicate that Client is in the Impaired range compared to her peers (VWMI = 70, 2nd percentile; 95% Confidence Interval = 65-79). **Her scores indicate that she struggles greatly with her visual working memory.**

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 26

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

(Emphasis added.)

Immediate Memory
The Immediate Memory Index (IMI) is a measure of one's ability to recall verbal and visual information immediately after the stimuli is presented. Client's score on the IMI is within the Moderately Impaired range (IMI = 65, 1st Percentile; 95% Confidence Interval = 61-73). **Her scores indicate that she struggles greatly with her immediate memory.** (Emphasis added.)

Delayed Memory
The Delayed Memory Index (DMI) is a measure of his ability to recall verbal and visual information after a 20 to 30 minute delay. On the DMI, he was in the Low Average range (DMI = 64, 1st Percentile; 95% Confidence Interval = 59-73). **Her scores indicate that she struggles greatly with her delayed memory.** (Emphasis added.)

**WMS-IV Results**

| | Standard Score | Scaled Score | Percentile | Classification |
|---|---|---|---|---|
| **Auditory Memory** | **69** | **3** | **2** | **Extremely Low** |
| Logical Memory I | | 4 | 2 | Impaired |
| Logical Memory II | | 5 | 5 | Borderline |
| Verbal Paired Associates I | | 6 | 9 | Low Average |
| Verbal Paired Associates II | | 4 | 2 | Impaired |
| **Visual Memory** | **67** | **3** | **1** | **Extremely Low** |
| Designs I | | 6 | 9 | Low Average |
| Designs II | | 4 | 2 | Impaired |
| Visual Reproduction I | | 3 | 1 | Moderate Impairment |
| Visual Reproduction II | | 6 | 9 | Low Average |
| **Visual Working Memory** | **70** | **4** | **2** | **Borderline** |
| Spatial Addition | | 6 | 9 | Low Average |

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 27

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
P: (425) 641-5353
F: (425) 747-0611

| | | | | |
|---|---|---|---|---|
| Symbol Span | | 4 | 2 | Borderline |
| **Immediate Memory** | **65** | **3** | **1** | **Extremely Low** |
| Logical Memory I | | 4 | 2 | Borderline |
| Verbal Paired Associates I | | 6 | 9 | Low Average |
| Designs I | | 6 | 9 | Low Average |
| Visual Reproduction I | | 3 | 1 | Moderate Impairment |
| **Delayed Memory** | **64** | **2** | **1** | **Extremely Low** |
| Logical Memory II | | 5 | 5 | Borderline |
| Verbal Paired Associates II | | 4 | 2 | Borderline |
| Designs II | | 4 | 2 | Borderline |
| Visual Reproduction II | | 6 | 9 | Low Average |

*Scaled scores and percentiles are based on the examinee's age.

**Wide Range Achievement Test – 4th Edition (WRAT4)**
The WRAT4 is test of academic achievement that helps in comparing one's current achievement levels with that of their same-aged peers and can also provide a grade-level equivalent in the areas of reading, spelling, and mathematics. Overall, she scored in the Low Average to Very Superior range of functioning in these areas and was at or significantly above expected performance ranges given her age.

Word Reading
On the Word Reading subtests, Client scored in the 86th percentile, which is in the High Average range of performance when compared to her same-aged peers (WR = 116; GE = >12.9; CI= 107-124). This assesses her ability to read both familiar and unfamiliar words fluently.

Sentence Comprehension
The Sentence Comprehension subtests assess one's ability to read and understand short passages by having them fill in the words that complete the appropriate meaning of the passage. Client scored in the 23rd percentile, or **Low Average range** (Emphasis added) compared to her peers (SC =89; GE = 11.5; CI = 82-97).

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

1

2

<u>Spelling</u>
The Spelling subtests seek to assess one's ability to spell familiar and novel words through a standard spelling test. Client scored in the 99.8[th] percentile, or Very Superior range (S = 144; GE = >12.9; CI = 133-151)

3

4

<u>Math Computation</u>
Math computation assesses one's application of learned math formulas by having them solve math equations of varying difficulty. Client scored in the 10th percentile, or Low Average range of achievement (MC = 81; GE = 5.4; CI = 72-92). **This is Client's area of greatest struggle.** (Emphasis added.)

5

6

7

8

<u>Reading Composite</u>
Reading Composite is a cumulative score of Client's word reading and sentence comprehension. With this, she scored in the Average range, or 55th percentile compared to her peers (RC = 102; CI = 96-108)

9

10

11

**WRAT4 Results**

| Index | Standard Score | Percentile Rank | Grade Equivalent | Classification |
|---|---|---|---|---|
| **Word Reading** | **116** | 86 | >12.9 | **High Average** |
| **Sentence Comprehension** | **89** | 23 | 11.5 | **Low Average** |
| **Spelling** | **144** | 99.8 | >12.9 | **Very Superior** |
| **Math Computation** | **81** | 10 | 5.4 | **Low Average** |
| **Reading Composite** | **102** | 55 | NA | **Average** |

12

13

14

15

16

17

*Scaled scores and percentiles are based on the examinee's age.

18

19        55.    In addition to the above tests, on December 12, 2023, more than a

20   year after her DIEP Flap Surgery, Dr. Jones administered to Plaintiff a 19 channel

21   Quantitative Electroencephalogram ("QEEG") assessment procedure[1], using the 10-

22

23   [1] Quantitative electroencephalography (QEEG) is a modern type of electroencephalography (EEG) analysis that involves recording digital EEG signals which are processed, transformed, and analyzed using complex mathematical algorithms. QEEG has brought new techniques of EEG signals feature extraction: analysis of specific frequency band and signal complexity, analysis of connectivity,

24

25

20 system with the BrainCore software and Q4 amplifier.  The results from this test

showed the presence of patterns in Plaintiff's brain specifically of struggles with

executive function, short-term memory recall and formation, borderline visual

working memory, extremely low immediate memory, extremely low delayed memory,

and other decreased measures of her cognitive functions.  Dr. Jones stated in his

report that:

> Results in the EC condition show elevated Delta throughout, and more
> particularly in the right frontal lobe along with elevated Beta in the right
> temporal region. Additionally, there is diminished Theta and Alpha
> bilaterally in the occipital lobe region. There is abnormal asymmetry in
> Beta throughout (63%), with lo-Beta being the predominant range of
> Beta in use. There are moderately high levels of hyperconnectivity
> throughout (69%).
>
> Results in the EO condition show elevated Delta bilaterally in the
> frontal and temporal lobes, and along with elevated Beta bilaterally in
> the parietal lobes. Additionally, there is diminished Theta and Alpha
> bilaterally in the occipital lobes and right parietal region. There is
> abnormal asymmetry in Beta throughout (50%). There are moderate
> levels of hyperconnectivity throughout (50%).
>
> **These patterns indicate struggles with executive function (frontal
> lobes), short-term memory recall and formation (parietal lobes),
> and information and sensory processing (occipital lobes). Results
> are often indicative of metabolic encephalopathy, TBI, pathogens,
> or neurotoxins, such as food sensitivities, heavy metal toxicity, or
> genetic conditions (MTHFR).**

---

and network analysis. The clinical application of QEEG is extensive, including
neuropsychiatric disorders, epilepsy, stroke, dementia, traumatic brain injury, mental
health disorders, and many others.
*See* National Library of Medicine, The Role of Quantitative EEG in the Diagnosis of
Neuropsychiatric Disorders. 2020 Jan-Mar, found at:
*https://pmc.ncbi.nlm.nih.gov/articles/PMC7175442/#R40*

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 30

**LePLEY LAW FIRM**
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

56.    Dr. Jones interpreted the above-listed comprehensive test results to provide objective medical evidence proving that Plaintiff had restrictions on and limitations to her ability to return to work:

> Results from comprehensive psychological testing reveal that Christine falls within the Extremely Low to Low Average range in cognitive functioning and that she is in the Extremely Low range in memory functioning. Her achievement range has much greater variance, ranging from the Low Average to Very Superior ranges. Given that her achievement scores that relate to procedural memory (word pronunciation/spell) are in the High Average to Very Superior range but her scores requiring working memory and processing speed (sentence comprehension/mathematics) are in the Low Average range, **there is significant evidence that there are neurocognitive deficits impacting specific areas of cognitive and memory functioning. Results from the QEEG Brain Map also support that both the areas related to executive functioning and memory formation and recall are significantly impaired.**

57.    Dr. Jones stated in his report that in his medical opinion, Plaintiff had significant restrictions and limitation on returning to work:

> However, it is apparent that given her current cognitive and memory functioning, Mrs. Christine Ocampo is unable to obtain or maintain employment at this time without significant and unreasonable accommodation and consistent assistance from family. As such, it is not reasonable to expect her to accomplish workplace tasks such as remembering instructions; following through assignments; completing tasks of even moderate complexity outside her existing procedural memory; learning new tasks, skills, or workflows; and working independently for more than a few minutes.

58.    The objective medical findings of all of the above tests administered by Dr. Jones are consistent with the symptoms that Plaintiff experienced since November 15, 2022, the date of her DIEP Flap Surgery; namely, significant cognitive

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 31

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1    and memory dysfunction and impairment.  As such, the results satisfy the Policy's

2    provision requirements that Plaintiff prove her disability by Objective Medical

3    Evidence of her medical condition giving rise to her disability.

4         59.    Guardian's physicians' consultants failed to explain in their review

5    reports why Dr. Jones' extensive comprehensive neuropsychological evaluation did

6    not provide sufficient medical evidence of Plaintiff's disability.  They incorrectly

7    focused on a single statement from the QEEG assessment that noted that Plaintiff

8    scored 6/15 on the REY-15 test, which is a scale that shows the effort level of the

9    patient.  They attempted to discredit the testing based on the single argument that

10   Plaintiff's efforts during the testing were low.  However, Dr. Jones' comments on the

11   report showed that Plaintiff "provided a moderate level of effort during cognitive

12   testing," which directly contradicts Guardian's arguments that Plaintiff's

13   psychological tests cannot be interpreted as a true measure of the claimant's

14   cognitive functioning.

15        60.    First, Plaintiff was examined on four different dates from November 14,

16   2023 to December 12, 2023.  During that time, she reported experiencing severe

17   cognitive decline, chronic fatigue and brain fog, difficulty in memory and

18   concentration, night terrors and sweats, sleep disturbances, and related side effects

19   from her cancer medication, Tamoxifen, as well as side effects from Lexapro and

20   Vyvanse.  Her subjective reporting of her disabling symptoms was supported by all

21   the tests' objective findings of cognitive decline and issues with Plaintiff's executive

22   function, memory recall and information, and sensory processing.

23        61.    A second explanation of why Plaintiff showed low scores on her

24   comprehensive neuropsychological evaluation was directly related to her disability

25   symptoms – poor endurance, difficulty in concentrating, brain fog, memory

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 32

1    dysfunction, and cognitive impairment. To argue that Plaintiff's tests did not

2    represent Objective Medical Evidence because she was not able to put the

3    necessary effort into the testing, when her level of effort was directly related to her

4    inability to concentrate and perform the test tasks, is identical to an argument that

5    Plaintiff did not adequately participate in the testing because she was disabled, but

6    her participation level in the testing still did not show objective symptoms of

7    disability. Such argument is inconsistent and flawed and is another example of

8    Guardian's blatant disregard for the overwhelming medical support for Plaintiff's

9    disability claim.

10         62.    A third reason is a known side effect of the medication Tamoxifen,

11   which affects Plaintiff's ability to concentrate on tests.  When Guardian's consultants

12   inquired whether Plaintiff could have exhibited "meandering" on her tests, Plaintiff's

13   treating physician, Dr. Shaulov, stated that he did not think Plaintiff was meandering

14   when she was evaluated and provided a direct response and an explanation of the

15   test results: that the medical records could indicate "poor effort" due to Plaintiff's

16   treatment with the medication Tamoxifen, which had a known side effect of reducing

17   estrogen levels in women and affected Plaintiff's ability to concentrate and focus, in

18   addition to the disabling symptoms that Plaintiff experienced.

19         63.    Moreover, Guardian's physicians' consultants never completed peer

20   review discussions with Dr. Jones to discuss his exams and evaluation of Plaintiff's

21   medical condition.  They claimed attempts were made to contact Dr. Jones' office on

22   April 10, and April 11, 2024, by phone and fax, and that three voicemails were left

23   requesting callbacks for peer review consultations on each date and three faxes

24   were sent to Dr. Jones' office on April 11, 2024.

25

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 33

**LePLEY LAW FIRM**
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1    64.    However, when Plaintiff contacted Dr. Jones office to verify if such

2    calls and faxes were in fact received, Ms. Casey C. from the Joy and Wellness

3    Center responded that there are no notes entered in Plaintiff's chart on either April

4    10 or April 11, 2024 with any voicemails or faxes received requesting peer review

5    consultations.  Thus, Guardian's consultants intentionally did not have any peer

6    review discussions with Dr. Jones in order to render biased opinions regarding

7    Plaintiff's eligibility for disability benefits.

8    65.    Another physician Plaintiff visited was Caner Sakin, M.D., a

9    rheumatologist with Valley Medical Center Rheumatology.  During her January 4,

10   2024 medical visit, he addressed the following issues: positive ANA (antinuclear

11   antibody) and chronic fatigue syndrome.  Plaintiff's blood test results were indicative

12   of some form of inflammation, consistent with the pain in her limbs that she

13   experienced on a regular basis.  Her lab tests indicated the following findings:

14   positive ANA, highly abnormal Centromere Pattern – reference interval ≤ 1:40

15   versus Plaintiff's test result of ≥1: 1280, and highly abnormal Anti-Centromere

16   Antibody – reference interval ≤ 1:40 versus Plaintiff's test result of ≥1: 1280. Thus,

17   another objective medical test – a blood test – provided medical evidence of

18   Plaintiff's disabling symptoms.

19   **Plaintiff's Appeal and Guardian's Failure to Adequately Investigate Plaintiff's Claim for Disability and the Denial of Plaintiff's Appeal**

20

21   66.    On February 9, 2024, Plaintiff promptly appealed Guardian's

22   termination of benefits.  In her appeal, Plaintiff reiterated that as of November 15,

23   2022, she experienced and continued to experience severe cognitive impairment;

24   poor functional memory; brain fog; inability to process information; concentration

25   problems; reduced comprehension; severe chronic fatigue; excessive sleepiness;

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 34

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1    neuropathy, and poor executive functioning.  She experienced insomnia, night

2    terrors, night sweats, and daily drowsiness that caused poor endurance and

3    necessitated extra naps during the day.  She also had breast pain and pain in the

4    surrounding area, carpel tunnel syndrome, and pain in the joints and limbs.  Her

5    prior ADHD diagnosis in her early years and the medications that she had to take in

6    addition to the cancer-related and pain-related medications caused Plaintiff to

7    experience extreme mood swings, exhaustion, anxiety, sensitivity to light, and

8    overall depressive moods that made it hard to complete her daily home activities, let

9    alone work responsibilities related to her highly demanding job as Chief Accounting

10    Officer.

11        67.    Enclosed with her appeal letter, Plaintiff provided to Guardian

12    voluminous medical evidence and statements from her treating physicians, thus

13    satisfying the Policy's requirement of providing sufficient Objective Medical Evidence

14    in the form of diagnostic testing, and medical records of a doctor's exam

15    documenting clinical signs, presence of symptoms and test results consistent with

16    generally accepted medical standards supported by nationally recognized authorities

17    in the health care field.

18        68.    Under ERISA, an insurer such as Guardian, as the Plan's claims

19    administrator, owes fiduciary duties to plan participants such as Plaintiff that include

20    the duty to conduct a reasonable investigation.; *Booton v. Lockheed Medical Benefit*

21    *Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997); *Capone v. Aetna Life Ins. Co.*, 592 F.3d

22    1189, 1200 (11th Cir. 2010); *Petrusich v. Unum Life Ins. Co. of Am.*, 984 F.Supp.2d

23    1112, 1119 (D. Or. 2013). An insurer cannot delegate its duty to conduct a

24    reasonable investigation to a third party. The plan administrator must engage in

25    "meaningful dialogue" with the plan participant. *Id*.  "If the administrator believes

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 35

**LePLEY LAW FIRM**
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1    more information is needed to make a reasoned decision, they must ask for it." *Id.*;

2    *see also Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 538 (9th Cir. 1990)

3    (burden is on the administrator to obtain information to make decision); *Abatie v. Alta*

4    *Health Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006)("A court may weigh a conflict

5    more heavily if, for example, the administrator . . . fails adequately to investigate a

6    claim or ask the plaintiff for necessary evidence.").

7          69.    Despite the voluminous medical evidence and Plaintiff's treating

8    physicians' certifications of disability in the claim file, on May 13, 2024, Guardian

9    denied Plaintiff's appeal, incorrectly concluding that LTD benefits were no longer

10   payable because Plaintiff's medical condition did not support restrictions and

11   limitations that precluded her from performing her own sedentary occupation on a

12   full-time basis.

13         70.    Moreover, Guardian violated its duty to thoroughly investigate the claim

14   and stated that it was not able to reach Plaintiff to verify her current medical status

15   before it discontinued her LTD benefits, and then incorrectly stated that Plaintiff

16   failed to return phone calls with voicemails from Guardian.

17         71.    Guardian incorrectly stated in its August 22, 2023 letter that it was not

18   able to reach Plaintiff to verify her current medical status.  However, the

19   Administrative Record indicated notes from two phone calls from Guardian to

20   Plaintiff on April 26, 2023 with claim representative Shelley Davis and a follow-up

21   phone call with Plaintiff on May 17, 2023, during which Guardian only discussed

22   Plaintiff's mailing address and direct-deposit information, not questions about her

23   medical conditions.  During those phone calls, Guardian never informed Plaintiff that

24   its physicians' consultants were not able to reach Plaintiff's treating physicians for

25   peer review consultations or requested any medical records.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 36

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

72.    Moreover, Plaintiff provided Guardian with the records of her cell phone carrier (Verizon), which showed that no calls were placed from Guardian to Plaintiff either on June 12, 2023 or August 21, 2023, which were two specific dates on which Guardian *falsely claimed in the Administrative Record that it placed phone calls*, which Plaintiff never returned, and that those phone calls left voicemails with requests for more information about her medical conditions.   This was simply a pretext for denying Plaintiff's appeal.

73.    Both Guardian's claim representatives and its physicians' consultants engaged in a pattern of claiming fictitious calls with voicemails were made, and faxes were sent to both Plaintiff and her treating physicians: Drs. Louie, Shaulov and Jones.  As indicated above, Guardian's physicians did not make the calls and did not send the faxes to Dr. Louie's correct phone and fax numbers and engaged in negligent claim investigation.  Dr. Jones' secretary confirmed his office did not receive any calls or faxes requesting peer review consultations.  Moreover, Dr. Shaulov's office stated that they have no records of any peer review consultations ever occurring.

74.    Thus, Guardian failed to adequately investigate Plaintiff's claim and collect all of the necessary information about her symptoms and medical providers records and opinions regarding her continued disabling symptoms and medical exams, and it incorrectly claimed that it had placed calls to Plaintiff, when in fact none of these calls were ever made, and incorrectly recorded the information discussed during the two phone calls that Plaintiff had with Guardian around the time of her claim denial.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 37

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

## Guardian's Biased "Paper Reviews" of Plaintiff's Medical Records

75.     Guardian relied on the opinions of its medical consultants: Dr. Nathan Easterlin, a plastic surgeon; Dr. Edan Critchfield, a neuropsychologist; and Dr. Justin Stamschror, a psychiatrist, who collectively opined that Plaintiff had no limiting conditions as of June 13, 2023 and beyond, and that the medical information on file and received on appeal did not support the claim that she was disabled and incapable of performing the major duties of her own occupation.

76.     The opinions of Guardian's biased "paper reviewers" are far less credible than the opinions of Plaintiff's highly qualified treating specialists, who examined Plaintiff in person, some of whom treated her for several years and, therefore, were much better suited to render credible opinions. *See Williams v. United Omaha*, 2013 WL 5519525, at *12 (N.D. Ala. 2013) citing *Nord*, 538 U.S. at 832 (courts are required to evaluate the weight of each doctor's opinion based on the extent of the patient treatment history and his qualifications).  That court explained why the opinions of a treating physician is usually more credible: "[D]irect contact with the patient over a period of time would provide a more thorough opportunity to assess her credibility regarding level of pain and the true pattern of her abilities." *Id.*  The court found the claimant disabled by focusing heavily on the opinions of her treating physicians.  *See also Jebian v. Hewlett-Packard*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (same). As detailed above, the medical evidence overwhelmingly establishes that Plaintiff was and is disabled from performing any type of gainful occupation during the relevant time, i.e., from November 15, 2022 onward.

77.     Instead of accepting the medical opinions of her highly respected treating specialists, Drs. Louie, Shaulov, Zamani and Jones, who each supported

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 38

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1   her disability, Guardian relied on the opinions of its biased medical consultants, who

2   conducted mere cold "paper reviews" of Plaintiff's medical records without ever

3   contacting Plaintiff for a phone consultation or in person examination.

4       78.    There are several problems with the conclusions of Guardian's "paper

5   reviewers" and thus Guardian's benefits decision that was based on their reports.

6   First, they are paid consultants with an inherent bias to side with the insurance

7   company that hired them and used them repeatedly to give disability opinions.

8   Courts have repeatedly criticized biased consultants' opinions in past disability

9   cases because these reports often are contrary to law, unreliable, obscure, and

10  plainly incorrect on medical facts; lack analysis; and ignore obviously important

11  medical evidence, just as they do in this case.[2]

12      79.    The Court should review Guardian's claim denial with skepticism

13  because Guardian relied on financially conflicted consultants who were beholden to

14

15  _____

16  [2] *See Tam v. First Unum Life Ins. Co.*, 491 F.Supp.3d 698, 706, 709-11 and fn. 11 (C.D. Cal. 2020)
    (The court criticized Unum's "on-site" family medicine physician, Dr. Norris, and Unum's other doctors
17  because they rendered opinions contrary to well-established law (including that objective evidence
    was required to prove a condition that cannot be proved by objective evidence chronic fatigue
    syndrome) and "mischaracterized and/or ignored evidence in the record," including when it was
18  "obvious" that Dr. Norris should not have); *Snapper v. Unum Life Ins. Co. of Am.*, 662 F. Supp. 3d
    804, 830, 851 (N.D. Ill. 2023) ("The abstruse character of Dr. Norris's opinions on these points is of
19  particular concern here because many of his opinions regarding more pedestrian issues are plainly
    incorrect. . . . On this basis, Dr. Norris . . . leaps to the conclusion that Snapper was malingering. . . .
20  But as Dr. Norris's observations on this point are entirely based on an erroneous premise, I accord
    them no weight."); *id.* at 851 ("A central problem with Dr. Norris's opinions is that . . . they are
21  presented at such a level of generality that they are virtually impossible to assess."); *id.* at 852 ("Here,
    too, Dr. Norris's argument is based on a mistaken view of the record."); *id.* ("Although Dr. Norris
    suggests that Lyrica was the only alternative that Snapper tried, the record shows that Snapper also
22  tried many others, including Cymbalta, Neurontin, Nucynta, and Amitriptyline."); *Twigg v. Reliastar
    Life Ins. Co.*, 2020 WL 5819547, at *12-13 (W.D. Ky. Sept. 11, 2020) (court criticized Dr. Spica for his
23  "fluctuating file review" opinions that significantly changed from one file review to the next and
    overturned the insurer's termination of disability benefits decision); *McDonnell v. First Unum Life Ins.*
24  *Co.*, 2013 WL 3975941, at *4, 6, 26 (S.D.N.Y. Aug. 5, 2013) (court criticized Unum's in-house
    neuropsychologist Dr. Spica and Unum's other doctors because they diagnosed the disability
25  claimant with a Conversion Disorder in a manner that violated the DSM–IV and that was unreliable as
    a matter of law).

the insurance industry. *See Demer v. IBM*, 835 F.3d 893, 901-03 (9th Cir. 2016); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).

80.    Guardian terminated Plaintiff's LTD benefits based on its physicians' consultants' "paper reviews" of Plaintiff's medical records, who are inclined to side with Guardian to deny benefits, and did not elect to retain an independent medical examiner to examine Plaintiff. *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635-636 (9th Cir. 2009). But "courts 'generally give greater weight to doctors who have actually examined the claimant versus those who only review the file, especially when they are employed by the insurer as here." *Radmilovich v. Unum Life Ins. Co. of Am.*, 701 F. Supp. 3d 984, 998 (C.D. Cal. 2023) (quoting Backman v. Unum *Life Ins. Co. of Am.,* 191 F. Supp. 3d 1053, 1066 (N.D. Cal. 2016)).

81.    Guardian elected not to perform an Independent Medical Examination of Plaintiff by hiring an unbiased physician: "While an ERISA claims administrator is not required to conduct in-person exams, the decision not to do so casts doubt on the "thoroughness and accuracy of the benefits determination." *Montour*, 588 F. 3d at 634; *Holmstrom v. Metropolitan Life Ins. Co.,* 615 F. 3d 758, 775 (7th Cir. 2010) ("None of the doctors who concluded that Holmstrom failed to establish disability ever examined her.")

82.    Guardian's medical consultants cherry-picked the medical records that Guardian provided to them. They selectively relied on the evidence that supported their "not-disabled" conclusions and ignored contrary evidence supporting disability.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 40

**LePLEY LAW FIRM**
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1   That is improper under the law and independently establishes that Guardian's

2   decision to discontinue LTD benefits was incorrect.[3]

3       83.     To support its erroneous decision, Guardian relied on Dr. Easterlin's

4   "paper review," who opined that as of June 13, 2023, Plaintiff had no limiting

5   conditions related to any surgeries performed by a plastic surgeon.  Dr. Easterlin

6   attempted to contact Drs. Louie, Shaulov, and Jones between April 10 and 12, 2024

7   for peer calls, but was unable to reach any of Plaintiff's physicians directly.

8   Nevertheless, without any in person or phone call examination of Plaintiff or

9   consultations with her treating physicians, Dr. Easterlin opined that Plaintiff was not

10  disabled.  He did not discuss Dr. Louie's three breast surgeries or consider the

11  common long-term disabling symptoms that patients with similar surgery histories

12  could experience after three major surgeries in the span of only ten months.

13      84.     Moreover, Dr. Easterlin's opinion clearly failed to give any weight or

14  otherwise factor in Plaintiff's own occupation as a Chief Accounting Officer for a

15  multinational corporation consisting of 34 subsidiaries globally, and the amount of

16  mental and physical ability and endurance it takes to perform her job.  Thus, his

17  opinion is unreliable, lacks analysis of the medical records and is contrary to the

18  medical evidence in Plaintiff's claim file.  He only offered opinions on restrictions

19  and limitations from the surgeries in the most conclusory manner.  He did not

20  address any other issues or any of her other medical conditions, claiming they were

21

22  _____

23  [3] See Stuart v. CVS Corp., 2010 WL 890181, at *6 & n. 3 (E.D. Mich. Mar. 10, 2010) (finding
    administrator's decision denying benefits to be arbitrary and capricious where file review physician's
    report indicated that physician had "selectively cherry-pick[ed] the medical records to support his non-
24  disability finding"); Black v. Hartford Life Ins. Co., 2019 WL 2422481, *7 (D. Oregon, June 10, 2019)
    (awarding benefits and finding insurer abused discretion because "Defendant has cherry-picked the
    evidence" by selectively picking "statements from the plaintiff's medical history that supported the
25  decision to terminate her benefits, while ignoring evidence to support her disability").

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN        **LePLEY LAW FIRM**
BENEFITS; ENFORCEMENT AND CLARIFICATION OF              **3633 136th Place SE, Suite 120**
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT                  **Bellevue, WA 98006**
INTEREST AND ATTORNEYS' FEES - 41                       **P: (425) 641-5353**
                                                        **F: (425) 747-0611**

1  outside the scope of his expertise.  His answers to the questions addressed to him
2  were short, without any analysis whatsoever and were only contained on a single
3  page that included the questions.  His conclusions were completely worthless.

4      85.    The second physician that Guardian hired to provide a biased opinion
5  was Dr. Critchfield, a neuropsychologist, who opined in his April 17, 2024's report
6  that from a neuro-psychological perspective, for the period of June 13, 2023
7  forward, the available records did not provide support for cognitive deficits that
8  would cause functional impairment that imposed activity restrictions/limitations or
9  otherwise prevented reliable and sustained full-time work activities.

10     86.    It is important to note that Dr. Critchfield used incorrect factual basis to
11  form his opinions, as he stated in the report that Plaintiff: "was employed in a
12  financial executive position until July 2023. Her ability to work at this level would not
13  be possible if she had experienced the severe level of impairment in her
14  neuropsychological testing…." But Plaintiff never returned to work since her first
15  breast surgery on November 15, 2022, and was not working in July 2023. In fact,
16  Plaintiff was terminated from her position as of July 21, 2023. What is even more
17  inconsistent is the fact that Dr. Critchfield's April 17, 2024 report specifically
18  indicated on page 3 that: "the claimant reported she was let go by her prior
19  employer in July 2023." He contradicts his own opinion of not-disabled by pointing
20  out that Plaintiff's medical tests support the findings that Plaintiff had the level of
21  impairment that would prevent her from working at her job.

22     87.    Thus, Dr. Critchfield's medical opinion is biased, inconclusive,
23  unreliable, and erroneous because it is based on the incorrect assumptions and
24  review of the medical evidence, as he failed to account for the fact that Plaintiff's
25  symptoms were severe and consistent with a neurological disorder preventing her

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 42

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1    from returning to work. Plaintiff was not employed at the time she complained of her

2    cognitive dysfunction and was experiencing these disabling symptoms continuously

3    since November 15, 2022.

4          88.    Dr. Critchfield further opined that while Plaintiff had reported being

5    limited due to cognitive deficits, it is important to note that her cognitive complaints

6    were longstanding with a prior diagnosis of ADHD made in 2015 or 2016. Plaintiff's

7    medical records did in fact indicate a prior diagnosis of ADHD, but that diagnosis

8    was old, and her symptoms related to ADHD were effectively managed with

9    medications prior to her disability on November 15, 2022.

10         89.    Additionally, there was no evidence in the medical records that

11   Plaintiff complained or missed work due to symptoms of brain fog, memory

12   dysfunction or cognitive deficits since she started working for her employer.  The

13   claim file indicates that her employer affirmatively stated that there were no prior

14   complaints related to Plaintiff's work performance (email from Plaintiff's employer to

15   Guardian on March 27, 2023, stating that Plaintiff never had any attendance or

16   performance issues before her disability), which is proof that Plaintiff could keep up

17   with her busy schedule and the demanding work responsibilities with her prior

18   diagnosis of ADHD.  Moreover, Plaintiff started working for Urovant in 2017 as its

19   VP of Finance, and when Urovant was acquired by Sumitovant in 2021, she was

20   hired and promoted by Sumitovant as its Senior Vice President and Chief

21   Accounting Officer, which is further evidence that her pre-existing ADHD did not

22   impair her job performance whatsoever.  Clearly, the medical symptoms that

23   Plaintiff was experiencing related to any existent ADHD diagnosis were completely

24   different and not severe enough when compared to the *newly developed cognitive*

25

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 43

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

*decline symptoms that she was experiencing as a result of her reconstructive breast*
*surgeries and medication treatment since November 15, 2022.*

90.     Dr. Critchfield pointed out in his review of the medical evidence that Plaintiff's 2023 neuropsychological evaluation reported cognitive impairment, and he noted that Plaintiff would be unable to maintain employment.  However, Dr. Crutchfield claimed that the evaluation included only one freestanding measure of performance validity, which was below expectation and was reported to reflect "poor effort levels."  Thus, he concluded that Plaintiff's cognitive test scores could not be relied upon to accurately reflect her current level of functioning, because her scores on measures of verbal and visual memory were extremely low (1st percentile), which was clearly inconsistent with her ability to present her medical appointments unaccompanied and provided her own history.

91.     Dr. Critchfield's inconsistent medical opinion failed to explain why he believed that Plaintiff's 2003 neuropsychological evaluation contained only "one freestanding measure of performance validity."  As stated above, Dr. Jones administered several tests recognized as valid measures in the psychiatrist community during his psychiatric evaluation, and Dr. Jones based his opinion of disability based on a comprehensive evaluation over several days, during which Plaintiff "provided a moderate level of effort during cognitive testing." Thus, Dr. Critchfield's opinion is illogical, inconsistent, unpersuasive, and not based on the correct facts or a thorough review of the medical records presented for his evaluation.

92.     None of Guardian's physicians' consultants discussed in their reports why the results of Dr. Jones' QEEG test and related neuropsychological tests during his comprehensive evaluation of Plaintiff were not valid or elected to perform other

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 44

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

1  neuropsychological tests on Plaintiff to dispute the validity of the tests' results.

2  Instead, all three physicians provided conclusionary, not based on any scientific

3  tests opinions that Plaintiff did not suffer from a neurocognitive disorder.

4       93.    Dr. Critchfield attempted to contact Drs. Louie, Shaulov, and Jones

5  between April 10 and 12, 2024 for peer-to-peer calls.  However, he was unable to

6  reach any of the physicians directly.  Thus, his medical opinions did not include a

7  meaningful dialogue with Plaintiff's treating physicians, who could have provided

8  relevant information regarding Plaintiff's eligibility for disability and should be

9  disregarded.

10       94.    Dr. Critchfield cherry-picked the medical records to evaluate Plaintiff's

11  condition.  When he could not avoid the fact that objective medical evidence

12  showed cognitive dysfunction and inability to work, he attempted to discredit the

13  records by pointing out that the results showed too much cognitive decline.  He also

14  incorrectly stated that Plaintiff was employed and working in July 2023, when in fact

15  she was disabled immediately following her DIEP Flap Surgery on November 15,

16  2022 and never returned to work.  Therefore, Dr. Crutchfield's conclusion that

17  Plaintiff lacked the appropriate treatment by her medical providers was based on an

18  incorrect factual basis and should be rejected as it is clearly lacking a proper

19  understanding and foundation of Plaintiff's medical records and the tests performed

20  by her treating physicians to diagnose her medical conditions giving rise to her

21  disability.

22       95.    Guardian's third physician consultant was Dr. Stamschror, a

23  psychiatrist, who opined that from the documentation provided, there was

24  insufficient evidence to support psychiatric restrictions or limitations from June 13,

25  2023 and beyond. However, Dr. Stamschror's opinion again included flawed

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 45

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

interpretation of the medical records, when he incorrectly stated that Plaintiff "had a completely normal mental status exam until February 22, 2023." He ignored the medical records showing Plaintiff had received psychotherapy treatment and medications from Dr. Shaulov's office since December 6, 2022 with complaints of poor cognitive function and fogginess.

96.     Plaintiff presenting at exams with a well-groomed appearance and an "okay" mood, as Dr. Stamschror's pointed out in his analysis of the medical records, did not indicate a lack of debilitating cognitive symptoms like extreme fatigue, brain fog, and memory dysfunction that she was experiencing daily.  He stated that "On November 14, 2023's exam, Plaintiff was noted to be well groomed and polite with good hygiene.  On December 14, 2023, she was noted on exam to be well developed and in no acute stress.  On February 5, 2024, she was noted to have well controlled symptoms of depression." None of these descriptions of Plaintiff's outward appearance and good hygiene are indicative of whether Plaintiff had restrictions and limitations to performing her job due to cognitive impairments. Imposing heightened standards and a requirement of poorly groomed outward appearance to prove cognitive impairment is indicative of extreme bias in providing his professional opinion, and disregard of the relevant medical tests and findings.

97.     Dr. Stamschror incorrectly deemed Plaintiff's outward appearance to be a measure of an objective symptom of her medical disability, stating that "If such impairment was supported, it would be expected that the medical records would include recent/ongoing documentation of evidence of symptomology such as deficiencies in grooming/hygiene, as individuals often neglect self-care when experiencing persistent and severe symptomology resulting from an impairing/incapacitating psychiatric condition."  To opine that only Plaintiff's looking

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 46

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1  disheveled and wearing dirty clothing would indicate a cognitive medical impairment
2  is a ridiculous thought and proves his biased opinion.

3      98.    Additionally, Dr. Stamschror incorrectly opined that Plaintiff was
4  required to undergo aggressive psychiatric medication management or that she was
5  supposed to be referred by her physicians to a level of care consistent and
6  commensurate with global impairment in functioning due to an underlying
7  psychiatric condition, such as intensive outpatient level of care, in order to prove her
8  disability.  That is incorrect.  Dr. Stamschror was not one of Plaintiff's treating
9  physicians, and he was not familiar with her medical history and medical conditions
10 well enough to allow him to give an opinion on what treatment she should have
11 been prescribed by her physicians.

12     99.    Moreover, Dr. Stamschror was required to review and evaluate the
13 treatments that Plaintiff in fact received from her treating physicians and her test
14 results' findings, versus providing an opinion on what his personal plan of treatment
15 would have been regarding Plaintiff's disabling symptoms.  It is irrelevant what test
16 results or medications she was not prescribed or ordered by her treating physicians,
17 because the treating providers possessed the required knowledge of Plaintiff's
18 medical history, and thus, they were more capable to prescribe the appropriate set
19 of tests and medical treatments.  Dr. Stamschror's review is biased, illogical,
20 inconclusive, and contrary to the medical evidence submitted by Plaintiff.

21     100.   Dr. Stamschror further opined that regarding the neuropsychological
22 evaluation on November 14, 2023, he had concerns related to the conclusions
23 drawn from this information.  He specifically reiterated Dr. Critchfield's' erroneous
24 conclusion that it did not appear that any formal measures of validity had been
25 utilized, which is the same language used in Dr. Critchfield's prior paper review,

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 47

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

1    which indicates that the physicians decided to focus and cherry-pick a certain catch-

2    all phrase to interpret Plaintiff's medical tests' findings versus taking the time to

3    review each test performed and provide an opinion of why the tests results did not

4    indicate a conclusion of disability.

5        101.    In his report, Dr. Stamschror stated: "It was commented that Ms.

6    Ocampo scored a score of 6 out of 15 on the Rey-15, indicating poor effort. She

7    was also noted on the WAIS to not answer several questions also causing

8    discontinuation criteria to be triggered. Based on the lack of validity testing as well

9    as documented low effort on measures of effort, the results of this testing cannot be

10   interpreted as a true measure of the claimant's cognitive functioning."  As stated

11   above, Dr. Jones already indicated Plaintiff presented moderate level of effort

12   during her testing, and Dr. Shaulov stated that Plaintiff's treatment with the

13   medication Tamoxifen affected Plaintiff's performance on some of the tests, in

14   addition to the disabling symptoms that Plaintiff experienced.

15       102.    Lastly, Dr. Stamschror stated that the diagnostic testing results from

16   the file did suggest a disparity between the objective findings and subjective

17   complaints.  However, a peer reviewer is required to evaluate and give credit to

18   both objective findings in the medical records and subjective complaints of the

19   claimant because some known symptoms like for example fatigue, brain fog, and

20   pain cannot be proven solely by objective testing.

21       103.    On April 16, 2024, Dr. Stamschror alleged that he completed a peer-

22   to-peer call with Dr. Shaulov.  Plaintiff attempted to confirm if such a consultation in

23   fact took place and was informed by Dr. Shaulov's office that there are no notes

24   entered on that date in her medical records according to their office procedures and

25   that Dr. Shaulov could not recollect if that peer consultation occurred.

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 48

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

104.   When asked about Plaintiff's neuropsychological testing by Dr. Jones, allegedly Dr. Shaulov stated that Plaintiff was taking Tamoxifen, which reduced estrogen levels, and that estrogen collapse might explain her cognitive impairment. Dr. Stamschror inquired about possible meandering, to which Dr. Shaulov allegedly stated that it was possible, but he did not believe that Plaintiff was engaged in deception.  Dr. Stamschror's attempts to reach Drs. Louie and Jones between April 10 and 12, 2024 were unsuccessful because he called the incorrect phone number and faxed to the incorrect area code his requests to Dr. Louie.  Thus, Dr. Stamschror's inconclusive and biased analysis of the medical records as to why Plaintiff showed cognitive impairment on her medical tests in a very low range was explained during the peer-to-peer call: it was due to her taking of certain medications that affected her hormonal balance and on her disabling symptoms.

105.   Despite the fact that Guardian retained three different physicians to provide opinions about Plaintiff's eligibility for disability and paid significant review fees, none of those physicians attempted to contact Plaintiff to interview her regarding her medical conditions' symptoms.  Moreover, Guardian's physician Dr. Stamschror indicated that there was "lack of validity testing" without describing what other tests should have been performed that would be sufficient to show validity. There were tests performed on Plaintiff that was a standard test procedure in the neuropsychology field, using the correct methodology and performed by an expert in the field – Dr. Jones.

106.   Plaintiff's treating physicians' opinions should be given significantly more credit in evaluating Plaintiff's disability because they did not have any ulterior motives to provide invalid, incomplete, or deficient analysis.  They used reliable, generally accepted in the scientific community methodology and tests and the

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES - 49

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

1    results provided Objective Medical Evidence of Plaintiff's disabling medical

2    conditions, proving Plaintiff had cognitive impairment and significant problems with

3    her memory and executive functioning directly related to her medical conditions,

4    entitling her to continued LTD benefits from June 13, 2023 to the present.

5        107.    Moreover, Guardian elected not to perform an Independent Medical

6    Examination by an unbiased physician, who could have examined Plaintiff and

7    rendered a medical opinion, as provided in the Policy's provisions.

8    **Guardian Failed to Take into Account the Significance of Plaintiff's "Own
     Occupation"**

9

10       108.    The Policy defines "Disability" as having a sickness or injury that

11   causes impairment to such a degree that Plaintiff is "not able to perform, on a Full-

12   Time basis, the major duties of Your Own Occupation."  And "Own Occupation" is

13   further defined in the Policy as "The occupation(s): (1) You are routinely performing

14   immediately prior to Disability; (2) which is Your primary source of income prior to

15   Disability; and (3) for which You are covered under this Plan.  Occupation includes

16   any employment, trade or profession that are related in terms of similar tasks,

17   functions, skills, abilities, knowledge, training, and experience required by Employers

18   from those engaged in a particular occupation in the general labor market in the

19   national economy."

20       109.    Immediately prior to Plaintiff's disability which commenced on

21   November 15, 2022, her major duties as Senior Vice President and Chief

22   Accounting Officer included being responsible for managing all accounting functions

23   across all of Sumitovant's entities.  Her job duties included: developing accounting

24   strategies, assisting external financial audits, drafting and reviewing reports and

25   statements, preparing presentations, and researching compliance procedures and

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 50

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

cost benefit strategies for both domestic and international accounting procedures. Plaintiff's daily schedule consisted of multiple meetings, sometimes starting as early as 7:00 a.m. until late in the evenings, past 11:00 p.m. because Sumitovant is a global organization with offices in Asia, the U.S., and Europe, and thus, required conference meetings in different time zones.

110.    Plaintiff worked in a fast-paced, challenging environment that required paying strict attention to detail, maintaining focus and concentration for extended periods of time, for over eight to ten hours daily.  The documents and data that she regularly reviewed were complex and had highly technical information, often involving technical language and interpretation of multi-continent accounting rules for entity financial consolidations and preparation of tax returns.

111.    Plaintiff's job was no mere sedentary office desk job.  Plaintiff's major duties were quite vast, very sophisticated and complex, mentally and cognitively intensive, requiring physical and mental endurance to endure long workdays, requiring a lot of focus, and requiring someone (such as Plaintiff) to have special skill sets, abilities, knowledge, training and significant experience in order to perform her job position adequately.  Any slight decline in cognitive and memory functioning, even to an average level, would certainly impair her ability to perform the major duties of her Own Occupation.

112.    Immediately prior to her disability (which commenced on November 15, 2022), Plaintiff was indeed performing her job at a high level.  She had the necessary mental and physical endurance to perform her job, and there were no issues with her work performance whatsoever.  But since her DIEP Flap Surgery on November 15, 2022 (and subsequent surgeries thereafter), she was not able to return to her job at Sumitovant due to her disabling symptoms of severe cognitive

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 51

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

impairment, memory and concentration problems, brain fog, impaired executive

functioning, and severe chronic fatigue among other symptoms.

113.    Guardian's medical consultants failed to consider Plaintiff's "Own

Occupation" and failed to factor in the significantly higher level of cognitive and

memory functioning, and higher level of mental and physical endurance that

Plaintiff's unique job required.

114.    Guardian's medical consultants never explained why they thought that

Plaintiff could perform her job duties as a Senior Vice President and Chief

Accounting Officer for a multinational corporation with no limitations despite her

severe cognitive dysfunction, nor did they address Dr. Zamani's detailed restrictions

and limitations in his certification letter.  Instead, the biased medical consultants

concluded without meaningful explanation that Plaintiff could return to work with no

restrictions.  Courts have repeatedly criticized insurers' (and others') medical

consultants for this precise conduct.[4]  Because Guardian's physicians' opinion

_____

[4] *See Carrier v. Aetna Life Ins. Co.*, 116 F. Supp. 3d 1067, 1083 (C.D. Cal. 2015)
("neither Dr. Niamehr nor Dr. McPhee provide much reasoned analysis supporting
their opposing conclusions"); *Ricks v. Comm'r of Soc. Sec.*, 2018 WL 3543083, at *6
(W.D. Ky. July 23, 2018) (rejecting doctor's opinions because the medical evidence
and face of his "own consultative examination report entirely contradicts" his
opinions); *Maynard v. Berryhill*, 2018 WL 2275558, at *12 (S.D.W. Va. Apr. 24,
2018), report and recommendation adopted, 2018 WL 2272919 (S.D.W. Va. May 17,
2018) ("When comparing Dr. Gale-Dyer's opinion to the clinical findings made during
his examination of Claimant, there is an obvious disconnect . . . Absolutely nothing
about the clinical notations provides a factual foundation for the extreme limitations
imposed by Dr. Gale-Dyer in his opinion"); *Workman v. Berryhill*, 2017 WL 3880661,
at *5 (E.D. Ky. Sept. 5, 2017) (rejecting Dr. Gale-Dyer's opinion because "if he had
referenced his own medical findings, he would have found that his opinions were
inconsistent with the objective medical evidence he observed during his
examination"); *Milpitas*, 187 Cal. App. 4th at 816 ("Dr. Feinberg provides no data or
clinical observations in support of his opinion"); *Wright*, 2018 WL 10900671, at *7

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 52

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

reports are internally inconsistent in that their ultimate conclusions do not logically

follow from the medical records; their opinions are not persuasive and should be

rejected by the Court.

115.    To date, Plaintiff's disabling symptoms from her three breast

reconstruction surgeries have not been resolved.  During the period from November

15, 2022 until the present, Plaintiff has continuously suffered from her disabling

symptoms that prevent her from working her own occupation or any other

occupation.  Plaintiff continues to experience cognitive impairment and severe

physical and mental fatigue and exhaustion, poor endurance, brain fog, limbs

tingling, insomnia, sleep terrors, night sweats, sleep disturbances, joint pain in hands

and other places, carpel tunnel syndrome, pain from the left knee downward, breast

pain, depression, anxiety, stress, mood swings, and sensitivity to light.

116.    Plaintiff's symptoms have rendered her disabled from working within

the meaning of the Policy.  Because of this, she is and was unable, at all times from

November 15, 2022 through the present and continuing, to perform with reasonable

continuity the material duties of her own sedentary occupation as a Chief Accounting

Officer or those of any other occupation for which she is qualified.

117.    Guardian's determination that Plaintiff was not eligible to receive LTD

benefits after June 13, 2023 is not supported by any of Plaintiff's treating physicians'

opinions or exams.  Guardian's physicians' consultants provided biased, invalid,

inconclusive, and unpersuasive cold "paper reviews" medical opinions, which were

contrary to the evidence in Plaintiff's medical records supporting disability.

---

(rejecting Dr. Emad's report because "nothing in the rest of Emad's review supports
[his] 'conclusion' ").

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

**FIRST CLAIM FOR RELIEF**

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest

under an ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiff against Guardian and Does 1 through 10)

118.    Plaintiff incorporates the previous paragraphs as though fully set forth herein.

119.    ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan, and/or to clarify her rights to future benefits under the terms of a plan.

120.    At all times relevant, Plaintiff has been entitled to LTD benefits under the Plan.  By terminating her LTD benefits under the Plan as of June 13, 2023, and by related acts and omissions, Guardian violated, and continues to violate, the terms of the Plan, and Plaintiff's rights thereunder.

121.    A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. § 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under ERISA: (1) a fiduciary must perform its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are adverse to the interests of the Plan, its participants, or its beneficiaries.  Guardian's handling of Plaintiff's disability benefit claim falls far short of these standards.

122.    For all the reasons set forth above, Guardian's decision to discontinue disability insurance benefits to Plaintiff was arbitrary, capricious, wrongful,

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611

unreasonable, irrational, contrary to the evidence, contrary to the terms of the Plan, and contrary to law.  Guardian abused its discretion by deciding to discontinue LTD benefits, as the evidence shows that its decision was arbitrary and capricious. Further, Guardian's decision and related actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  Guardian's denial of Plaintiff's claim for continued LTD benefits after June 13, 2023 constitutes an abuse of discretion.

123.    As a direct and proximate result of Guardian's denial of continued disability benefits, Plaintiff has been deprived of LTD benefits from June 13, 2023 onward.

124.    As a direct and proximate result of the denial of her claim for continued LTD benefits after June 13, 2023, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees, pursuant to 29 U.S.C. Section 1132(g)(1).

125.    A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to LTD benefits past June 13, 2023.  Plaintiff seeks the declaration of this Court that she meets the Plan definition of "disability" and is entitled to benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claim's administrator for a determination of Plaintiff's claim that is consistent with the terms of the Plan.

126.    Plaintiff alleges all the same conduct against Does 1 through 10 as it does against Guardian in this First Cause of Action and in this Complaint.

**LePLEY LAW FIRM**
**3633 136th Place SE, Suite 120**
**Bellevue, WA 98006**
**P: (425) 641-5353**
**F: (425) 747-0611**

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court grant the following relief against all Defendants:

1. For all Plan benefits due and owing to Plaintiff, including LTD benefits.

2. For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g),

3. For pre-judgment and post-judgment interest on the principal sum, accruing from the date on which the obligations were incurred. *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992). Specifically, Plaintiff seeks interest at the rate of 12% per annum, pursuant to RCW 19.52.010.

5. For such other and future relief as this Court deems just and proper.

DATED this 8th day of April, 2025.

LePLEY LAW FIRM

/s *Patrick H. LePley*
Patrick H. LePley, WSBA No. 7071

McKENNON LAW GROUP PC

By:/s *Robert J. McKennon*
    Robert J. McKennon

By:/s *Joseph S. Hoff*
    Zlatina T. Meier f

20321 SW Birch St., Suite 200
Newport Beach, CA 92660
949-387-9595 / Fax: 949-385-5165

*Pro Hac Vice applications to be submitted*

Attorneys for Plaintiff Christine Ocampo

PLAINTIFF'S COMPLAINT FOR RECOVERY OF ERISA PLAN
BENEFITS; ENFORCEMENT AND CLARIFICATION OF
RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT
INTEREST AND ATTORNEYS' FEES - 56

LePLEY LAW FIRM
3633 136th Place SE, Suite 120
Bellevue, WA 98006
P: (425) 641-5353
F: (425) 747-0611